UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FLOR GONZALEZ, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 3:26-cv-1609 |
| v. | § | |
| | § | |
| GIBSON, DUNN, & CRUTCHER LLP, | § | JURY TRIAL DEMANDED |
| | § | |
| *Defendant*. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff Flor Gonzalez ("Plaintiff" or "Ms. Gonzalez") files this Original Complaint and Jury Demand against her former employer, Defendant Gibson, Dunn & Crutcher LLP ("Defendant" or "Gibson Dunn"), for violations of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 ("Title VII"), 42 U.S.C. §§2000e *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601 *et seq.*, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §12101 *et seq.*, and any other cause of action to be inferred or established by the facts set forth herein. In support of her claims, Ms. Gonzalez would respectfully show the Court as follows:

## I. PRELIMINARY STATEMENT

1.    This action arises from over two years of Defendant's discriminatory treatment of Ms. Gonzalez. Throughout her employment, Ms. Gonzalez was repeatedly denied promotions and subjected to negative performance evaluations that lacked factual support, while similarly situated white, non-Hispanic/Latino employees were promoted under shifting and inconsistent rationales, and less experienced white, non-Hispanic/Latino, new employees were hired at a higher level. A supervisor mocked Ms. Gonzalez's accent and communication style, and after Ms. Gonzalez

1

reported her for discriminatory conduct, Defendant permitted the same supervisor to continue exercising authority over her for over six months, including writing a negative mid-year review in retaliation. Defendant further discouraged and interfered with Ms. Gonzalez's rights under the FMLA and failed to provide reasonable accommodations for her disability in violation of the ADA. Taken together, these actions reflect a pattern of discrimination and retaliation that culminated in Ms. Gonzalez's termination.

## II. **PARTIES**

2.      At all times relevant hereto, Ms. Gonzalez is an individual residing in Collin County, Texas.

3.      Gibson, Dunn & Crutcher LLP is a general domestic partnership incorporated under the laws of the state of Delaware. Defendant's principal place of business is located at 333 South Grand Avenue, Los Angeles, CA 90071. Counsel for Defendant, Rachel W. Robertson, Gibson, Dunn & Crutcher LLP, 2001 Ross Avenue Suite 2100, Dallas, TX 75201, has agreed to accept service of process in this action on behalf of Defendant.

## III. **JURISDICTION AND VENUE**

4.      The Court has federal question jurisdiction under 28 U.S.C. §1331 because Ms. Gonzalez's cause of action arises under Title VII.

5.      The Court has personal jurisdiction over Defendant, which employed Ms. Gonzalez at all relevant times, conducts substantial business in Texas, and maintains multiple offices in the state. Defendant's contacts with Texas are sufficient to subject it to personal jurisdiction in this Court.

6.      Venue exists in this district and division as detailed in 28 U.S.C. §1391. Specifically, the venue is proper in the United States District Court for the Northern District of Texas, Dallas Division, pursuant to 28 U.S.C. §§1391(b).

## IV. <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>

7.      Within 300 days of some of the adverse actions complained of in this action, Ms. Gonzalez timely filed a charge of discrimination with the EEOC. The preceding actions exhibit a continuing violation, or ongoing pattern of discrimination, and a hostile work environment. As such, we request they be considered in addition to the actions which occurred within the 300 days.

8.      On February 18, 2026, the EEOC issued its Right to Sue Notice to Ms. Gonzalez (the "Right to Sue Notice")  reflecting that Ms. Gonzalez has timely filed this Complaint within 90 days of its issuance.

## V. <u>STATEMENT OF FACTS</u>

9.      Plaintiff Flor Gonzalez was employed by Defendant Gibson, Dunn & Crutcher LLP as a Senior Manager of Client Development-Litigation from approximately February 13, 2023, until her termination on April 10, 2025. She was based out of Defendant's Dallas office.

10.      Plaintiff is Hispanic/Latino and of Guatemalan national origin.

11.      Beginning in summer 2023 and continuing throughout 2024, Plaintiff experienced a pattern of discrimination and retaliation, including interference with her FMLA leave and Gibson Dunn's refusal to grant necessary and reasonable ADA accommodations.

12.      During the summer of 2023, Plaintiff informed her supervisor, then-Co-Chief Marketing & Business Development Officer ("Co-CMO"), Kate Ruggieri, that she was diagnosed as a pre-diabetic and would need limited ADA accommodations to prevent becoming diabetic. The request was directed by Plaintiff's physician, to intentionally allocate windows of time on calendar

to prepare and eat smaller meals throughout the day, rather than just eating once or twice a day in larger amounts, as well as taking a small window of time—no more than 20 minutes or so—to walk.

13.     In light of consistently working almost non-stop 12-16 hour days due to being short-staffed and under supported on an ongoing basis, Plaintiff discussed with Ms. Ruggieri a reasonable accommodation: approval to be away from her laptop multiple times a day in short spurts to avoid becoming diabetic. Instead of initiating the interactive process to determine a reasonable accommodation, Ms. Ruggieri discouraged Plaintiff's involvement in the process and doubted her need for accommodation. While Ms. Ruggieri agreed that Plaintiff had to eat, she stated that she herself also doesn't always eat, and that it is "the nature of the beast." She told Plaintiff that if she stepped away, it could not interfere with her responsiveness to incoming requests, and discouraged Plaintiff from taking "too many" breaks due to "the flurry of incoming requests on a regular and constant basis" and "not enough bandwidth".

14.     On or about October 2, 2023, Plaintiff was diagnosed as diabetic and her physician scolded her for not taking breaks from work throughout the day to plan and prepare her meals properly. Plaintiff's physician again encouraged her to take the time as needed for her health and to remember that she had the right to request those small accommodations and have them approved.

15.     On the advice of her doctor, Plaintiff followed up with Ms. Ruggieri and informed her that she had now become diabetic and would need to ensure her reasonable accommodations were approved. Again, rather than initiate the interactive process, Ms. Ruggieri stated that Plaintiff did not need the accommodations she was requesting. Ms. Ruggieri conveyed to Plaintiff : "do what you have to do, but without failing to be available and responsive in a timely manner because

4

[Ms. Ruggieri] didn't have bandwidth to cover." In short, Ms. Ruggieri discouraged Plaintiff again from requesting reasonable accommodations. Plaintiff sought to get approval for additional support for her team, but Gibson Dunn refused to do so for more than a year.

16.     Gibson Dunn's definition and standards of "responsiveness" was disproportionately and harshly applied to other women of color. For example, Ms. Ruggieri discouraged Black female employees she supervised from taking lunch breaks that interfered with work, but encouraged flexibility for white, male employees—regularly granting requests for flexible work schedules, time off, and vacations.

17.     During summer 2024, another one of Plaintiff's supervisors, Katherine Diggs, then-Director of Client Development-Litigation. discouraged Plaintiff from leaving the office even for a few minutes to pick up her prescriptions. Unlike white employees, Ms. Ruggieri dictated the precise window in which Plaintiff could "go and come back quickly" to retrieve her prescriptions. On one occasion after Plaintiff raised complaints about her, Ms. Diggs told Plaintiff she could either go out during a storm or forego the opportunity completely. Other managers were not subjected to the same level of micro-management or requirements to remain in the office and forego even the shortest of personal errands.

18.     During December 2023 and January 2024, during the annual evaluation period, Plaintiff experienced discriminatory promotion and evaluation practices, including the denial of promotions to qualified people of color, while awarding promotions to similarly situated white employees. Ms. Gonzalez also observed employees of color receiving reduced ratings and negative performance reviews without any evidentiary basis.

19.     Despite stellar reviews, praises, and no performance issues, Plaintiff was denied a promotion, purportedly on the basis that she had worked for Defendant for less than a year. But, a

white male employee on her team with even less tenure and documented performance issues was promoted.

20.     On multiple occasions, Ms. Diggs mocked or pretended not to understand Plaintiff, who is Hispanic. Similarly, around January 2024, Ms. Ruggieri told Plaintiff that she should take speaking classes.

21.     Plaintiff was not the only target of this discriminatory conduct. Plaintiff witnessed Ms. Ruggieri pretend not to understand another team member who is also Hispanic and refuse to work with her or give her the opportunity to work on special or firmwide projects.

22.     Throughout summer 2024, Plaintiff personally observed discriminatory conduct including Ms. Diggs' refusal to provide coverage and support to managers of color, disproportionate to white managers. Plaintiff reported these concerns to Ms. Ruggieri and Defendant's Human Resources Department ("HR"), via Hannah Mikus, Associate Director of HR.

23.     In November 2024, Ms. Ruggieri, prevented the hiring of a candidate by instructing Plaintiff to halt requesting an offer letter from HR because the candidate had recently been pregnant and "had a baby that needed to be taken care of." Plaintiff reported this conduct to HR, after which Ms. Ruggieri was demoted. HR confirmed the demotion was related to the report. Defendant created a special "Head of Strategic Projects" role for Ms. Ruggieri. In that role, Ms. Ruggieri formally exercised control over decisions regarding Plaintiff's employment until January 2025. After January 2025, Ms. Ruggieri's control informally continued through her close relationship with the second Co-CMO, Kelly MacKinnon, who took the full role of CMO in January 2025 following Ms. Ruggieri's demotion. Upon information and belief, Ms. Diggs was similarly demoted. In December 2024, Ms. Diggs was made the new "Director of Executive Coaching." In January 2025, Ms. Diggs left Gibson Dunn.

24.    In December 2024, Ms. Ruggieri issued Plaintiff negative performance evaluations based on missed deadlines. After no evidence was provided to support the missed deadlines, Plaintiff requested that Ms. Ruggieri correct the evaluations. Ms. Ruggieri denied the request.

25.    When Plaintiff filed a complaint with HR, they stated there was "no precedent" for correcting the evaluations—despite the lack of evidence of missed deadlines—and did not initiate investigative or corrective action. Therefore, the negative evaluation that had no foundation remained on Plaintiff's performance record.

26.    Also in December 2024, Plaintiff informed her team that she planned on taking FMLA so that they could plan for coverage in advance. Plaintiff repeatedly expressed to Ms. Ruggieri that she would need to take FMLA to care for her mother for the duration and shortly after her mother's upcoming medical procedures. Ms. Ruggieri told Plaintiff she did not need to take FMLA and that she should find alternative care for her parents and their medical needs. She pointed out that the firm has alternatives to FMLA such as caretaker services. Plaintiff thanked Ms. Ruggieri for pointing out additional resources but expressed that she wanted to take care of her own mother and it was in the best interest of her mother's well-being. Ms. Ruggieri reiterated that she did not need to take FMLA and directed her to research those alternative options instead. Throughout December 2024 and January 2025, Defendant discouraged Plaintiff from requesting FMLA.

27.    During December 2024 and January 2025, a second cycle of discriminatory promotion and evaluation practices occurred, including denial of promotions to employees of color, fabricated performance criticisms, lowered ratings, and retaliatory evaluations affecting compensation and bonuses. And, in January 2025, Rachel Hoffman, a white female with less

industry and overall experience than Ms. Gonzalez and a similarly situated Black female Senior Manager on the team, was hired at a higher level as Associate Director – Litigation.

28.    When Plaintiff inquired about why her and a similarly situated Black female Senior Manager were not interviewed or considered for the role, Ms. MacKinnon informed them that role was specifically created for Ms. Hoffman.

29.    Around the same time, Plaintiff raised concerns about suspected discriminatory and retaliatory motives causing her lower compensation and bonuses with Ms. MacKinnon, who told her to stop complaining and just move forward from it.

30.    Throughout 2025, Plaintiff and a similarly situated Black employee consistently received less tactical and senior-level support than white male employees and newer white female hires. When Plaintiff raised concerns, they were dismissed without further investigation or correction.

31.    During January 2025, Ms. MacKinnon, took on the full role of CMO. On or around January 16, 2025, Ms. MacKinnon traveled to Dallas to meet with Plaintiff and began efforts to push her out of the company through intimidation and constructive termination tactics. Ms. MacKinnon told Plaintiff she was ready to be Chief Marketing Officer, but implied that opportunity would not exist for her at Gibson Dunn. When Plaintiff asked why she would not be able to continue her growth trajectory with Defendant, Ms. MacKinnon only stated that she was being supportive of Plaintiff's growth. Plaintiff asked if Ms. MacKinnon had constructive feedback. Ms. MacKinnon said she didn't have any, that she could obtain feedback from the partners, but it was "going to get ugly" and that the Plaintiff may want to leave before that negative feedback was provided. Plaintiff reassured Ms. MacKinnon that she wanted to stay and welcomed

any feedback. Ms. MacKinnon grew visibly frustrated and hit the table with her hands. The meeting ended shortly thereafter.

32.    Throughout February and March 2025, Plaintiff was consistently held to a higher standard than her white counterparts. On one occasion, a project was provided and completion requested for that same afternoon. Though Plaintiff provided it that same afternoon as requested, Amanda Krane, new Senior Director of Client Development - Litigation, emailed Plaintiff and told her that in the future if she is going to miss a deadline, she should provide a heads up, despite Plaintiff clearly meeting the deadline.

33.    On another occasion, a project deadline was missed due to a white male manager being out of the office. Rather than ask all the managers available that day to cover what happened, Ms. Krane only scheduled a call with Plaintiff and a Black female senior manager, holding only them accountable. Plaintiff and the Black female senior manager asked Ms. Krane why the white managers were not included in the meeting or being held equally accountable, particularly since they were copied on all projects that day and were aware that Plaintiff and the Black female senior manager were tied up with multiple time-sensitive requests. Ms. Krane stated that they couldn't jump in because they didn't know where anything was and they could not look for data in so many places. This excuse was particularly striking because the white managers had received more training than the Plaintiff or Black female senior manager on where and how to find this particular data set.

34.    Prior to March 5, 2025, Ms. Krane and Ms. MacKinnon reorganized the team organizational chart and reallocated practices and industries for the team as well as the support under each manager. Plaintiff was transitioned from a team serving several of the firm's highest-earning practices/clients, to one which served lower-earning practices/paying clients, directly

9

impacting her ability to continue her established relationships and path to continued success and related compensation. Plaintiff was allocated practices and industries which Ms. Ruggieri and Ms. MacKinnon had previously stated were obsolete or should be obsolete. Plaintiff raised the concern to Ms. Krane that this reorganization was unfair, discriminated against the minority member managers and team members, and gave preferential treatment to the similarly situated white managers and team members in the Department. Plaintiff also raised the concern that the reorganization was designed to push out the minority managers and team members, especially because Ms. Krane and Ms. MacKinnon both had stated previously that if people did not like the way things were run, they could leave.

35.    On March 13, 2025, Plaintiff raised another concern with Ms. Krane that she felt that what they were doing is allocating the "obsolete" practices and industries so that when they terminated her, they would have already proactively bridged the anticipated gap. Ms. Krane only stated that it was an opportunity to support practices that require proactive approaches rather than reactive and that it would set Plaintiff and a similarly situated Black Senior Manager and their coordinators to grow faster, and then abruptly ended the conversation.

36.    On April 3, 2025, a team coordinator reported discriminatory and retaliatory conduct affecting multiple team members of color to Defendant's HR department. Although the coordinator repeatedly followed up after April 3 and had previously raised concerns that Plaintiff was being targeted in an effort to build a discriminatory and retaliatory case for termination in violation of Defendant's policies and the law, no substantive response was provided until the afternoon of April 10, 2025—the same day Plaintiff was terminated. In that response, HR disclosed that additional employees of color on the team were also experiencing discrimination and were part of a simultaneous investigation.

37.     On April 4, 2025, Plaintiff sent an email to partners in the Antitrust & Competition group, advising that support responsibilities had changed due to reorganization and thanking them for the opportunity to work together. The email had been discussed beforehand with Ms. Krane, who intended to follow up with additional transition details.

38.     On April 8, 2025, Ms. MacKinnon and Defendant's management falsely claimed that Plaintiff had been instructed not to send the email. During the reprimand, management alleged it should not have been sent because the person taking over the practice group—a white woman— was still unprepared for the transition. Plaintiff specifically shared that she would later be accused of not communicating the transition properly if she hadn't done so. Ms. Krane said she would speak to Ms. MacKinnon and let her know that it was the result of Plaintiff's good intentions and that she would follow up with Plaintiff. Instead, she abruptly left on vacation. This email was later used as a pretext for Plaintiff's termination

39.     On April 10, 2025, Defendant terminated Plaintiff's employment. The stated rationale was Plaintiff's April 4, 2025 email regarding the transition.

## VI. CAUSES OF ACTION

40.     Plaintiff repeats and re-alleges the foregoing paragraphs as though fully set forth herein

41.     Defendant's discriminatory actions give rise to the following causes of action.

**COUNT ONE:**
**RACE DISCRIMINATION**
*(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq.)*

42.     At all relevant times, Plaintiff was an employee of Defendant and a member of a protected class under Title VII: Hispanic/Latino.

43.    Plaintiff, and other employees of color, were repeatedly denied promotions based on factual inaccuracies and fabrications, while similarly situated and less-experienced white employees were promoted.

44.    Throughout 2023 and 2024, Plaintiff and other employees of color were denied promotions, while Defendant granted white employees' promotions and higher titles upon hiring based on inconsistent ad shifting rationales.

45.    Plaintiff and another colleague of color, a Black female, were consistently provided less support and coverage than their similarly situated white male and white female colleagues.

46.    Plaintiff was targeted by a white supervisor, Ms. Ruggieri, and given a negative evaluation without any support. After Plaintiff requested supporting documentation for the critiques contained in the  evaluation and none was found, Ms. Ruggieri and Defendant's Human Resources (HR) department failed to remedy the situation. Plaintiff is unaware of unsubstantiated, negative performance reviews being provided to white employees.

47.    Plaintiff and a Black female employee were disproportionately singled out for projects that were not their responsibility and for which they voluntarily devoted time.

48.    When Plaintiff raised concerns about racially disparate treatment, Defendant failed to investigate or remedy the situation.

49.    Plaintiff has been denied equal employment opportunities, income, and career advancement because of her race, whereby she has suffered and will continue to suffer both irreparable injury and compensable damages unless and until this Court grants relief.

**COUNT TWO:**
**NATIONAL ORIGIN DISCRIMINATION**
*(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq.)*

50.    Plaintiff's nation of origin is Guatemala.

51.     Plaintiff's direct supervisor, Ms. Diggs, mocked Plaintiff's accent and communication style on more than one occasion and pretended not to understand Plaintiff, in front of fellow colleagues causing embarrassment and humiliation.

52.     Defendant's actions constitute accent discrimination, a form of national origin discrimination.

53.     Defendant denied promotional opportunities to Plaintiff while affording such opportunities to similarly situated white, non-Guatemalan employees.

54.     Plaintiff has been denied equal employment opportunities, income, and career advancement because of her race, whereby she has suffered and will continue to suffer both irreparable injury and compensable damages unless and until this Court grants relief.

**COUNT THREE:**
**RETALIATION**
*(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq.)*

55.     Plaintiff repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

56.     Plaintiff engaged in protected activity under Title VII when she: (1) reported the discriminatory promotions and evaluations disproportionately affecting employees of color; (2) reported discriminatory hiring practices when she refused to hire a recently pregnant interviewee; (3) reported discriminatory comments and jokes; and (4) discussed ongoing concerns and active complaints with HR on April 8, 2025 and received no response.

57.     Defendant was at all times aware of Plaintiff's protected activity.

58.     Following Plaintiff's protected activity, Defendant took adverse employment actions against Plaintiff, including; (1) creating a special role for her then-supervisor Katherine, in which she still exercised decision-making power over Plaintiff's conditions of employment;; (2)

not initiating prompt investigations following complaints of discrimination, allowing Plaintiff to be subject to continuous race and national origin discrimination under biased supervisors; and (3) ultimately terminating her employment on April 10, 2025, shortly after Plaintiff's April 8, 2025 complaint and a similar complaint filed by a department team member on March 5, 2025, both having not been investigated nor resolved in advance of Plaintiff's termination.

59.     A causal connection exists between Plaintiff's protected activity and the adverse employment actions taken against her. The temporal proximity between Plaintiff's protected complaints and the subsequent escalation of adverse actions supports an inference of retaliation.

60.     After Plaintiff engaged in protected activity, Plaintiff was subjected to retaliatory action that would dissuade a reasonable employee from engaging in protected activity

61.     Defendant's conduct constitutes unlawful retaliation in violation of Title VII, whereby Plaintiff has suffered and will continue to suffer both irreparable injury and compensable damages unless and until this Court grants relief.

### COUNT FOUR:
### FAILURE TO ACCOMMODATE
*(Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et seq.)*

62.     Plaintiff requested reasonable accommodations first in October 2023 and throughout 2024.

63.     Defendant failed to initiate the interactive process required to determine whether a reasonable accommodation existed for Plaintiff's disabilities and diagnoses. Instead, Defendant repeatedly told Plaintiff she did not need accommodations.

64.     Defendant violated the ADA by failing to engage in the interactive process and/or refusing to accommodate Plaintiff.

14

**COUNT FIVE:**
**FMLA INTERFERENCE**
*(Family and Medical Leave Act, 29 U.S.C. §2601 et seq.)*

65.    Throughout the end of December 2024 and beginning of 2025, Plaintiff made several attempts to plan in advance for coverage for upcoming FMLA leave to care for her mother following a medical procedure.

66.    Instead of allowing Plaintiff to request FMLA and fill out the corresponding paperwork, Plaintiff repeatedly discouraged Plaintiff from seeking FMLA as a resource.

67.    Defendant interfered with Plaintiff's protected rights under the FMLA.

## VII. <u>DAMAGES</u>

68.    Plaintiff has suffered actual damages in the form of past and future lost wages, lost benefits, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

69.    It was necessary for Plaintiff to hire the undersigned attorney to protect her rights. Plaintiff is entitled to an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988(b).

70.    Plaintiff is entitled to prejudgment and post judgment interest at the highest lawful rate.

## VIII. <u>JURY TRIAL</u>

71.    Plaintiff demands a jury trial.

## IX. <u>PRAYER</u>

72.    Plaintiff respectfully requests judgment against Defendant as follows:

   a. A judgment declaring that the practices complained of herein are unlawful and in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e *et seq.*, the Family and Medical Leave Act, 29 U.S.C. §2601 *et seq.*, the

15

Americans with Disabilities Act of 1990, 42 U.S.C. §12101 *et seq.*, and any other cause(s) of action that may be inferred from the facts set forth herein;

b. All damages which Plaintiff sustained as a result of Defendant's conduct, including back pay, front pay, general and specific damages for lost compensation, lost employment benefits, pecuniary and non-pecuniary losses resulting from Defendant's discriminatory and retaliatory practices, including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, and embarrassment;

c. All contractual or other wage-related damages to which Plaintiff is entitled, including any unpaid compensation or benefits owed;

d. Exemplary and punitive damages in an amount commensurate with Defendant's ability to pay and sufficient to deter future malicious, reckless, or intentionally unlawful conduct;

e. An award of all reasonable attorney's fees, expert witness fees, court costs, and other costs incurred in connection with this action;

f. Prejudgment and post judgment interest, as provided by law;

g. That the Court retain jurisdiction over Defendant until such time as it is satisfied that Defendant has remedied the unlawful practices complained of and is in full compliance with applicable law.

h. Granting Plaintiff such other and further relief as this Court may deem just and proper.

73. Plaintiff further requests all such other legal and equitable relief as the Court may deem just, proper, and appropriate.

16

Respectfully submitted,

*/s/ Kathryn "Kassi" Yukevich*
Kathryn "Kassi" Yukevich
Texas Bar No. 24133390
Carter Law Group PC
351 W Jefferson Blvd.
Suite 503, LB 11
Dallas, TX 75208
Tel. 214.390.4173

**ATTORNEY FOR PLAINTIFF**

17